### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

Timothy M. Miller II,

     Plaintiff,

     v.

SBK Delivery, LLC,

     Defendant.

Case No. 2:21-cv-4744

Judge Michael H. Watson

Magistrate Judge Deavers

## OPINION AND ORDER

Plaintiff moves for partial summary judgment in this Fair Labor Standards Act ("FLSA") case. Mot. Partial Summ. J., ECF Nos. 85 & 87. Specifically, Plaintiff moves for summary judgment as to liability on the overtime claims, leaving for trial damages on the same as well as liability on his breach-of-contract claim. *Id.* Defendant opposes. Resp., ECF No. 99. For the following reasons, Plaintiff's motion for partial summary judgment is **GRANTED IN PART** and **DENIED IN PART**.

## I.    ANALYSIS

The pertinent facts and standard of review were set forth in the Court's prior opinion and order granting in part and denying in part Defendant's motion for summary judgment. They will not be repeated herein, except that relevant facts will be discussed below.

## A. Misclassification

Plaintiff first seeks summary judgment on the issue of whether Defendant misclassified him as an independent contractor, who is not entitled to overtime wages under the FLSA, instead of an employee, who is entitled to such overtime wages. *See* 29 U.S.C. § 207; *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 728 (1947).

With limited exceptions that are not relevant here, the FLSA defines an "employee" merely as "any individual employed by an employer." 29 U.S.C. § 203(e)(1). "Employ," in turn, means "to suffer or permit to work." 29 U.S.C. § 203(g).

In keeping with the broad remedial purpose of the FLSA, the Sixth Circuit interprets these sections of the statute "to set forth a standard that employees are those who as a matter of economic reality are dependent upon the business to which they render service." *Keller v. Miri Microsystems LLC*, 781 F.3d 799, 807 (6th Cir. 2015) (internal quotation marks and citation omitted). Thus, courts within the Sixth Circuit employ the "economic reality" test to determine whether workers are employees or independent contractors. *E.g.*, *Gilbo v. Agment, LLC*, 831 F. App'x 772, 775 (6th Cir. 2021).

The economic reality test eschews labels chosen by the parties in favor of analyzing six traditional factors to elucidate the actual working arrangement:

> 1) the permanency of the relationship between the parties; 2) the degree of skill required for the rendering of the services; 3) the worker's investment in equipment or materials for the task; 4) the

> worker's opportunity for profit or loss, depending upon his skill; 5) the
> degree of the alleged employer's right to control the manner in which
> the work is performed; and 6) whether the service rendered is an
> integral part of the alleged employer's business.

*Id.* (cleaned up). In addition to those six traditional factors, however, the Circuit has also considered things like whether the defendant had "authority to hire or fire the plaintiff" and whether it "maintain[ed] the plaintiff's employment records." *Keller*, 781 F.3d at 807 (internal quotation marks and citation omitted). No single factor is determinative, and the ultimate question concerns the plaintiff's economic dependence or independence from the defendant. *Id.* (citation omitted).

The Court therefore considers each factor as it relates to Plaintiff and Defendant, keeping in mind that "[w]hether a FLSA plaintiff is an employee is a mixed question of law and fact." *Gilbo*, 831 F. App'x at 775 (internal quotation marks and citation omitted); *see also Keller*, 781 F.3d at 804 ("Ordinarily, it is the court's job to determine whether a company has inappropriately classified a worker as an independent contractor."). And, "material factual disputes regarding employment status may require resolution by a factfinder in close cases." *Werner v. Bell Fam. Med. Ctr., Inc.*, 529 F. App'x 541, 543 (6th Cir. 2013) (citations omitted); *Keller*, 781 F.3d at 804 ("[W]hen the evidence . . . reveals that there is a genuine dispute of material fact whether the worker is an employee or an independent contractor, then summary judgment is inappropriate." (citations omitted)).

### 1. The Permanency of the Relationship Between the Parties

The first factor concerns the permanency of the relationship between

Plaintiff and Defendant. As the Sixth Circuit has explained,

> independent contractors [generally] have variable or impermanent working relationships with the principal company because they often have fixed employment periods and transfer from place to place as particular work is offered to them, whereas 'employees' usually work for only one employer and such relationship is continuous and indefinite in duration. If a worker has multiple jobs for different companies, then that weighs in favor of finding that the worker is an independent contractor. We may look at the length and regularity of the working relationship between the parties, but even short, exclusive relationships between the worker and the company may be indicative of an employee-employer relationship.

*Keller*, 781 F.3d at 807 (cleaned up).

In addition, whether Plaintiff had the *right* to work for other companies

while driving for Defendant is one factor to be considered, but a non-exclusive

relationship does not defeat an employer-employee relationship. *Id.* at 808. The

Court also considers things like how much control Plaintiff had over the "number

of days per week he worked and how many jobs he took each day[.]" *Id.*

Here, Plaintiff and Defendant entered into an Independent Contractor

Agreement ("Agreement"). Nothing in the Agreement limited the duration or

permanency of delivery drivers' work, meaning the workers were free to continue

working for Defendant indefinitely. *See* Independent Contractor Agreement, ECF

No. 87-3. Indeed, of the nineteen individuals who attempted to opt into this suit,

most worked for Defendant for more than six months, with seven of the nineteen

working for Defendant for over a year. *See* Mot. Summ. J., Ex. D, ECF No. 87-4;

Mot. Summ. J. Ex. B, ECF No. 87-2 at PAGEID # 1169–70. Plaintiff worked for Defendant for approximately nine months, and he worked exclusively for Defendant during that period. Timothy Miller Decl. ¶ 2, ECF No. 87-5; Timothy Miller Dep. 13:9–12, ECF No. 56.

Also weighing in favor of permanency is that fact that even workers hired to assist with seasonal delivery demands were permitted to keep working for Defendant after the seasonal demands subsided. Kantor Dep. 19:23–20:7, ECF No. 87-1. Further, some evidence suggests the drivers were presumed to work full-time at the end of their four-week probationary period, and Kantor's[1] deposition suggests that work was regularly available for all delivery drivers. Kantor Dep. 17:1–20:7, 41:1–9, ECF No. 87-1.

On the other hand, Defendant submitted evidence that, notwithstanding the opt-in plaintiffs' experiences, many drivers worked for less than six months and that there was a "high turnover rate[]" among Defendant's drivers. Kantor Decl. ¶ 11, ECF No. 99-1. Defendant also stresses that it did not require its drivers to sign a non-compete agreement and that, in fact, at least two of its drivers performed other work in addition to delivering packages for Defendant. *See generally*, Independent Contractor Agmt., ECF No. 87-3; Kantor Decl. ¶¶ 7, 11, ECF No. 99-1 ("The contract is at-will for both parties as opposed to a term contract and does not contain a non-compete clause."); *see also, e.g.*, Lee Dep.

---

[1] Bradley Kantor is the co-owner of Defendant and testified as its 30(b)(6) representative.

27:23–28:21, ECF No. 83 (testifying that he worked for Barry's Bagels and Mitchell's Steakhouse during the same period he worked for Defendant); Pantoja Dep. 36:12–37:14, ECF N0. 66 (testifying that he performed moving services on his days off to supplement his income from Defendant). In addition, Kantor declared that Defendant's drivers could "work as much or as little as they want[ed]" and could select both the days of the week and the hours that they worked. Kantor Decl. ¶¶ 4, 6, ECF No. 99-1.

As a threshold matter, the Court places no weight on the absence of a non-compete clause/the workers' ability to simultaneously perform services for other companies. Although some of Defendant's drivers performed other work in addition to delivering for Defendant, the Sixth Circuit has recognized that "employees may work for more than one employer without losing their benefits under the FLSA." *Keller*, 781 F.3d at 808 (internal quotation marks and citation omitted); *see also Acosta v. Off Duty Police Servs., Inc.*, 915 F.3d 1050, 1058 (6th Cir. 2019) ("[W]hether a worker has more than one source of income says little about that worker's employment status."). The fact that one or two drivers may have held other jobs to supplement his income does not weigh in favor of finding independent contractor status, especially given that the other jobs were not delivering packages. Indeed, Lee's testimony is more indicative of an employee working several full- or part-time jobs to make ends meet than working as an independent contractor who bounces from job to job as work becomes available.

Next, the Court considers the average length of work.  The Sixth Circuit has found that where a worker worked for a company, and only that company, for seven months, this first factor weighed in favor of finding an employment relationship.  *Gilbo*, 831 F. App'x at 776.  Here, if Plaintiff's evidence is believed, most drivers (including Plaintiff) worked for Defendant for over six months, which would make this factor weigh in favor of employment status.  Nonetheless, given the conflicting testimony about the amount of time drivers typically worked for Defendant, the Court concludes that there is a genuine dispute of material fact as to the typical amount of time drivers performed services for Defendant.

Moreover, "[s]chedule variability can serve as an indicator of independent-contractor status," and it is undisputed here that Defendant's delivery drivers could choose their own schedules, including how many days and hours to work. On the other hand, evidence suggests the workers were expected to work every day.  Kantor Dep. 41:1–9, ECF No. 87-1.

All in all, there is a genuine dispute as to whether this factor weighs in favor of employment status or independent contractor status.

### 2. The Degree of Skill Required for the Rendering of the Services

The second factor explores the skills required to perform the work as well as where the worker gained those skills.  *Keller*, 781 F.3d at 809 (citation omitted).  The Court therefore considers such things as whether Plaintiff learned his skills "through formal education, an apprenticeship, or years or experience," which would suggest independent contractor status, or whether "the company

provide[d] all workers with the skills necessary to perform the job" or had a short training period, which suggests an employee status.  *Id.* (citation omitted); *see also Gilbo*, 831 F. App'x at 776 ("This factor assesses the complexity of the work performed, how the worker acquired their skill, and the length of the worker's training period." (citation omitted)).

Defendant contends this factor weighs in its favor because "drivers need good navigation and map skills, quick thinking to move along efficiently, physical strength, and stamina" to perform deliveries.[2]  Resp. 18, ECF No. 99.

The Court rejects Defendant's argument and concludes there is no genuine question of fact as to the amount of required skill; Defendant's drivers are not skilled workers.  The undisputed evidence shows that the drivers were not required to have any particular level of education, any certifications, or any other type of job qualifications prior to being hired.  Mot. Summ. J. Ex. 2 at PAGEID # 1172.  Indeed, Plaintiff lacked not only experience as a delivery driver before working for Defendant but also lacked regular driving experience.  Timothy Miller Decl. ¶¶ 3–4, ECF No. 87-5 ("I had no previous experience working as a delivery driver prior to beginning work for Defendant. . . . Ms. Bickham offered to hire me as a Delivery Driver for Defendant when I only had a temporary driving permit.  I was told I could start work for Defendant right away

---

[2] Like most assertions in Defendant's briefs in this case, no citation to record evidence is provided for support.

once I took my driver's license test and obtained a driver's license."); *Id.* at

PAGEID ## 1230–31 (text messages).

It is true that Defendant's drivers who delivered for Watco were required to

perform a one-day ride-along before driving routes by themselves, but that

requirement was imposed by Watco rather than Defendant, was not imposed

until late 2019 or early 2020, and was "[m]ainly [to] get used to using the apps

that the contractors provided."  Kantor Dep. 37:18–38:19, ECF No. 87-1.  In

addition, there was a three-day "[h]ands on" training period in which the driver

learned where to obtain a "manifest, how to use the phone application, Sort,

Load, Deliver and how to trouble shoot potential issues."  Mot. Summ. J. Ex. H,

ECF No. 87-8.  Thus, Defendant fully expected that, after a single ride-along and

three days of training, a driver "should be ready to cover a delivery route without

someone else riding" along.  *Id.*

Given that the only skills required of Defendant's drivers were to operate a

motor vehicle[3] and track the delivery of packages on a smartphone app—

especially where any required training to do those two things was minimal and

provided directly by Defendant—this factor weighs toward finding employee

status.  *Compare Keller*, 781 F.3d at 809 (finding a genuine dispute of material

---

[3] The parties have not indicated that drivers drove semi-trucks or performed long-haul
drives, which would require a higher degree of skill.  *Bonnetts v. Arctic Exp., Inc.*, 7 F.
Supp 2d. 977, 982 (S.D. Ohio 1998) ("It is undisputed that driving a truck containing
large loads of cargo requires a significant degree of skill.  The job requires the skill of
handling a large vehicle, detailed knowledge of the national roadways, and a high level
of stamina to be able to make long trips without fatigue.").

fact on this factor where a satellite-dish-technician was certified and had to use power tools, know National Electrical Code provisions, and have basic computer skills but the defendant taught the one-day certification course the technician was required to pass) *with Acosta*, 915 F.3d at 1056 (finding this factor weighed in favor of employment status where workers received a four-hour training session and relied on "common sense" to provide security services to customers).

### 3. The Worker's Investment in Equipment or Materials for the Task

The third factor "compares the worker's total investment in the company to 'the company's total investment, including office rental space, advertising, software, phone systems, or insurance,' and 'is most significant if it reveals that the worker performs a specialized service that requires a tool or application which he has mastered.'" *Gilbo*, 831 F. App'x at 776 (quoting *Keller*, 781 F.3d at 810). Moreover, when considering this factor, the Court must remember that "there are inherently some capital investments that do not necessarily evidence economic independence" because the investment is used also largely for personal purposes. *Keller*, 781 F.3d at 810.

Here, Plaintiff and other delivery drivers made a low investment in equipment or materials needed for the task as compared to Defendant. Indeed, Defendant provided most of the vehicles necessary for deliveries and automobile insurance for the same, a gas card for the purchase of gas, and hooded sweatshirts with Defendant's branding for the drivers to wear during deliveries. Kantor Dep. 14:12–18, 31:7–32:3, 47:23–48:4, ECF No. 87-1; *see also* Sample

Independent Contractor Agmt. ¶ 1, ECF No. 87-3 ("SBK will provide Contractor with use of its vehicles, electronic devices, communication media, and any other tools, materials, devices and equipment necessary for Contractor to perform its services for SBK, all at SBK's cost and expense.").

The drivers, it seems, provided only their own mobile Android phones and a data plan necessary for the operation of the app used to track deliveries. Mot. Summ. J. Ex. H, ECF No. 87-8 at PAGEID # 1240. There were no other tools or materials that the drivers needed to obtain to work for Defendant. Mot. Summ. J. Ex. B, ECF No. 87-2 at PAGEID # 1172.

Even when a worker uses his or her own vehicle, a vehicle has been found to be the type of investment that does not necessarily weigh in favor of economic dependence because of its utility to everyday life. *Keller*, 781 F.3d at 810; *Acosta*, 915 F.3d at 1056–57 ("The vehicles used by sworn and unsworn workers—which they simply parked and sat in for hours at a time—required no specialized mastery."). Especially here, where the drivers overwhelmingly did not own the delivery vehicles and the instruments they did own (cell phones) are largely used for personal purposes, the Court concludes there is no genuine dispute of material fact that Plaintiff's investment pales in comparison to Defendant's such that this factor favors employee status.

### 4. The Worker's Opportunity for Profit or Loss, Depending Upon His Skill

The fourth factor considers whether the worker "had an opportunity for greater profits based on his management and technical skills." *Keller*, 781 F.3d at 812 (citation omitted). The ability to complete more jobs by increasing efficiency weighs in favor of finding independent contractor status, while the inability to earn more by increasing efficiency weighs in favor of an employee status. *Gilbo*, 831 F.App'x at 777 (citing *Keller*, 781 F.3d at 813).

Here, the only way Plaintiff and other drivers could increase their profits was by delivering more packages. In other words, drivers were unable to earn more profits per package by honing their delivery skills. Mot. Summ. J. Ex. 2, ECF No. 87-2 at PAGEID # 1175 ("The only form of payment was 50% of client's payment for packages delivered.").

Moreover, nothing in the record suggests that the ability to deliver more (and thereby earn more) depended on skill. For one thing, the initial placement of a driver on a route was based entirely on Defendant's coverage need; not the driver's skill. *See* Kantor Dep. 22:5–9, ECF No. 87-1. And, once a driver was placed with a Master Contractor[4] ("MC"), the driver typically remained with that MC; there is no evidence the drivers were given better routes as their delivery skills increased. *Id.* at 21:15–22:9.

---

[4] As explained in the prior Opinion and Order, MCs hired Defendant to perform delivery services for the MC. Defendant, in turn, assigned its drivers to routes to provide delivery coverage for the various MC's needs.

Within those established routes, the evidence suggests little opportunity to deliver more by increasing skill. A set route is a set route, and the amount of time it takes to drive that route may vary with traffic and the speed limit, but there is no evidence it varies with skill such that drivers could simply "deliver better" to enable them to take on more routes. Instead, the evidence suggests that a driver's ability to earn more hinged on the driver working additional days, regardless of their skill level.

Therefore, although Defendant contends that the drivers could earn more money by taking on more routes, this does not weigh in Defendant's favor; any increase in profits was based purely on working *more* as opposed to working *better*. *See Acosta*, 915 F.3d at 1059 ("ODPS maintains that because workers could accept or reject work, they effectively controlled their opportunities for profit or loss by managing their workload. While the decision to accept or reject work is a type of managerial *action*, the relevant question is whether workers could increase profits through managerial *skill*." (citation omitted)); *Rutherford*, 311 U.S. at 730 ("While profits to the boners depended upon the efficiency of their work, it was more like piecework than an enterprise that actually depended for success upon the initiative, judgment or foresight of the typical independent contractor."). The Court thus rejects Defendant's arguments to the contrary and concludes there is no genuine dispute of material fact on this factor, and it weighs in favor of employment status.

## 5. The Degree of the Alleged Employer's Right to Control the Manner in which the Work is Performed

Within this factor, the Court considers things like the degree of control Plaintiff had over his schedule. *Keller*, 781 F.3d at 814. Plaintiff's freedom to reject assignments and take vacation days is relevant but "not sufficient to negate control." *Id.* (internal quotation marks and citation omitted).

Also relevant to this factor are such things as whether Defendant could discipline or fire Plaintiff, whether Plaintiff was required to wear a uniform, and the extent to which Defendant supervised or dictated the performance of Plaintiff's day-to-day work. *Keller*, 781 F.3d at 814. But, "the absence of need to control should not be confused with the absence of right to control, and the actual exercise of control requires only such supervision as the nature of the work requires." *Acosta*, 915 F.3d at 1051 (cleaned up).

Here, there is some evidence suggesting Defendant possessed the right to control its drivers. First, only Defendant chose which MCs to provide delivery services for, and each of those MCs created specific package delivery routes. Kantor Dep. 15:10–24, ECF No. 87-1. Typically, there was consistency in the routes that the MCs hired Defendant to provide coverage for, although variation was possible. *Id.* at 16:21–18:16. When it came to determining which of Defendant's drivers would take which pre-established route, Defendant made the initial placement based on coverage needs. *Id.* at 21:6–14. The driver would then typically stay with the MC with whom the driver was initially placed. *Id.* at

22:5–9. The drivers therefore had little control over which routes they drove or for which MC they provided delivery services.

Second, there is some evidence that the drivers had little control over their schedules. Drivers were required to sign a training agreement that stated the drivers would be terminated if they called off work during the hands on training period or during the following four-week probationary period. Mot. Summ. J. Ex. H, ECF No. 87-8 at PAGEID # 1240; *see also* Kantor Dep. 41:1–9, ECF No. 87-1 (noting the above provision was included "to emphasize the importance of being there every day once you were a full-time driver with us.").

Third, some evidence suggests Defendant's drivers were all paid the same rate—a flat fee of 50% of the amount Defendant received from the MC for the packages that driver delivered for that MC. Mot. Summ. J. Ex. B, ECF No. 2 at PAGEID # 1175 ( "The only form of payment was 50% of client's payment for packages delivered.").

Fourth, and regarding control of the driver's day-to-day work, the drivers were forced to undergo Defendant's training process before beginning work. Moreover, drivers were told to contact Kantor or another person from Defendant with any questions they might have after beginning work with Defendant. Kantor Dep. 56:10–19, ECF No. 87-1. Defendant also required its drivers to complete pre- and post-route vehicle inspections using an app called "Whip-Around." *Id.* at 29:2–8. The Whip-Around inspection required drivers to track a vehicle's pre-route milage, note any pre-route damage to the vehicle, note the post-route

mileage, and note any post-route damage to the vehicle, while uploading various photographs of the vehicle in connection with the same; at some point, the app also permitted drivers to log the number of packages delivered. *Id.* at 29:16–30:10; *see also* ECF No. 87-2 at PAGEID # 1173 ("The putative plaintiff must confirm that the packages were delivered each day . . . There is no package logging, tracking, or reporting duties except for confirmation that the packages were delivered.").  This Whip-Around inspection was required solely by Defendant and was not done at the request of the MCs, the Department of Transportation, or in connection with any other law. *Id.* at 30:11–22.

Fifth, Defendant purported to have authority to terminate Plaintiff for not following Defendant's rules.  Mot. Summ. J. Ex. E, ECF No. 87-5 ("Brad is here with me he said [yo]u have a choice if you can[']t follow Our rules its best we go different ways[.]").

On the other hand, some evidence suggests Defendant did not have much control over its drivers.  For example, drivers were supposed to contact the MCs, not Defendant, for any delivery issues unrelated to problems with the delivery vehicle.  Kantor Dep. 26:9–23, ECF No. 87-1.  Moreover, there is some evidence that, even though Defendant assigned a driver to a specific route, the assignments were made pursuant to the driver's decision.  Kantor declared that he gave new drivers "the option to work any available route" and that some drivers "requested specific routes because of it being closer to their home or

because it was a shorter, longer, or easier route." Kantor Decl. ¶ 13, ECF No. 99-1.

Second, once a route was assigned to a driver, the driver could choose the order in which to deliver the packages along that route, without being monitored by Defendant. *Id.* "During their deliveries, the [drivers] were free to go home for a break, do childcare, take a long lunch, complete an errand, and even nap . . . " and "were not monitored by [Defendant]." *Id.* The only requirement from Defendant was that the drivers report to Defendant the number of packages delivered, so that Defendant could verify that it received proper payment from the MC for that driver's work. *Id.* Any additional requirements were placed on the driver by the MC for whom the driver was delivering packages, not by Defendant. *Id.* ¶ 15 ("A new driver needed to learn the procedures of the MC. The procedures were imposed by the MC, not [Defendant].") And, drivers' pay was never deducted if the driver failed to perform the Whip-Around "requirements." Kantor Dep: 47:11–13, ECF No. 87-1.

Third, as noted above, Kantor averred that Defendant's drivers controlled their schedules and "can work as much or as little as they want, can make more money by working more hours or better routes, and can schedule their deliveries each day as they desire within the scope of the [MC]'s delivery time. The only practices that need to be followed are those of the [MC], not [Defendant]." Kantor Decl. ¶ 4, ECF No. 99-1. In addition to choosing the hours they wanted to work for Defendant, Kantor averred that the drivers were "permitted to work for

other delivery companies, themselves, or enter additional contractor or employment relationships." *Id.* ¶ 7.

Fourth, contrary to Plaintiff's assertion, Kantor averred that the drivers could negotiate their per-package rate of pay, or even negotiate a flat-free per day or week, before agreeing to work for Defendant. *Id.* at ¶ 6.

Fifth, Defendant offered evidence that it did not control the day-to-day manner in which the drivers' performed their deliveries. As mentioned above, Kantor averred that the drivers were free to arrange the deliveries along the prescribed route however the driver saw fit; were able to take breaks as desired; were not held to any of the requirements in the training agreement, and that Defendant "does not have procedures" for drivers. *See generally*, Kantor Decl., ECF No. 99-1.

Sixth, although Defendant provided branded hooded sweatshirts for the drivers, Defendant had no required uniform. Kantor Decl. ¶ 18, ECF No. 99-1 ("[Defendant] did not require its drivers to wear uniforms."); Kantor Dep. at 31:17–32:3, 65:14–66:4, ECF No. 87-1 (testifying that Defendant had no uniform requirement for its drivers and that the hooded sweatshirts were gifts). Moreover, each MC could, and sometimes did, provide Defendant's drivers with its *own* branded clothes, but not all drivers wore that apparel, and Defendant "didn't harp on it too much." Kantor Decl. ¶ 18, ECF No. 99-1 ("On its own accord, Watco and Lasership distributed insignia clothes for the drivers to wear.

Some drivers wore the MC insignia clothes, while other drivers did not."); Kantor
Dep. 31:17–21, 64:9–66:4, ECF No. 87-1.

Seventh, Kantor testified that the attendance policies in the training
agreement were not enforced. *Id.* at 67:6–68:7. Kantor also testified that
Defendant did not terminate or discipline employees. *Id.* at 68:11–12 ("Again,
there was no consequences that would be faced by us."); *id.* at 68:17–19 ("Q. If
they were late or didn't show up, was there any discipline? A. No."); *see also*
Kantor Decl. ¶ 9, ECF No. 99-1 ("If a driver did not show up for work when he
had previously advised he would be there, neither I nor anybody else at
[Defendant] administered discipline or terminated the contract.").

In *Keller*, the Sixth Circuit concluded that there was a genuine dispute of
fact regarding control when the defendant did not directly control the day-to-day
aspects of the installation technician's job but did require technicians to perform
their jobs in accordance with the ultimate hiring company's specifications and
provided those specifications to the technicians. 781 F.3d at 814; *see also*
*Acosta*, 915 F.3d at 1061 ("Although ODPS did not supervise the day-to-day
performance of its workers, such close supervision is not necessary to establish
control. Further, the level of supervision necessary in a given case is in part a
function of the skills required to complete the work at issue." (citation omitted)).
Here, both Plaintiff and Defendant have offered conflicting evidence regarding
the level of control Defendant could (or did) exercise over its drivers. The Court

therefore similarly concludes there is a genuine dispute of material fact on this element of the economic realities test.

### 6. Whether the Service Rendered is an Integral Part of the Alleged Employer's Business

With respect to the sixth factor, "[t]he more integral the worker's services are to the business, then the more likely it is that the parties have an employer-employee relationship." *Keller*, 781 F.3d at 815 (citation omitted).

Here, Defendant's business is providing delivery services for other companies. Thus, the delivery drivers *are* Defendant's business for all intents and purposes. *Cf. Acosta*, 915 F.3d at 1055 ("ODPS could not function without the services its workers provide." (citation omitted)). Defendant does not attempt to argue otherwise, and this factor weighs in favor of finding an employment relationship.

### 7. Other Pertinent Considerations

"The economic-reality test is not an exclusive list of factors." *Keller*, 781 F.3d at 815. Accordingly, the Court may consider anything else that bears upon the nature of the parties' working relationship.

Defendant argues that the parties' contracted to designate Plaintiff as an independent contractor. Resp. 16–17, ECF No. 99. But the Sixth Circuit caselaw clearly "reject[s] contractual intention as a dispositive consideration in [the] analysis" for the simple reason that "[t]he FLSA is designed to defeat rather than implement contractual arrangements." *Imars v. Contractors Manu. Servs.,*

*Inc.*, No. 97-3543, 1998 WL 598778, at *5 (6th Cir. Aug. 24, 1998) (cleaned up). As such, the intent of the parties does not break the tie here.

### 8. Conclusion Regarding Misclassification

Here, four of the factors weigh in favor of finding that Plaintiff was an employee. The other two—permanency of the relationship and right to control the worker—have genuine issues of material fact that preclude finding whether they favor employee or independent contractor status. No single factor is determinative, and conclusions on the permanency of the relationship and right to control Plaintiff's work will undoubtedly be important to the determination. The Court therefore concludes that "these factors provide mixed results and so tell us very little." *Imars v. Contractors Mfg., Servs., Inc.*, 165 F.3d 27 (6th Cir. 1998). The conclusion on two important factors, and "[t]he appropriate weight of the factors[,] can be more properly assessed after a trial." *Id.* The Court therefore denies Plaintiff's motion for summary judgment on the misclassification issue.

## B. Failure to Pay Overtime

As noted in the Opinion and Order on Defendant's motion for summary judgment, the MileZero data submitted by Plaintiff shows that he worked more than forty hours in at least one workweek during the statute of limitations. For example, from October 19, 2020, through October 23, 2020, it shows that Plaintiff worked a total of forty-five hours and twenty-two minutes. Resp. Ex. Q at lines

2242–2246 (column G), ECF No. 87-17.[5]  Moreover, it is undisputed that Defendant failed to ever pay Plaintiff overtime.  Mot. Partial Summ. J. Ex. B, Interrog. No. 23, ECF No. 85-2 ("The only form of payment was 50% of client's payment for packages delivered.").

Although Defendant argued that some of the other putative opt-in plaintiffs took non-compensable breaks, Defendant did *not* argue that any portion of the hours Plaintiff worked were non-compensable.  Indeed, the only evidence concerning Plaintiff that was presented to the Court suggests that Plaintiff did *not* take non-compensable breaks.   T. Miller Dep. 72:5–74:10, ECF No. 56 (testifying that, if he ate lunch at all, it would typically be while driving). Defendant's evidence that drivers were permitted to take breaks, and its citations to other putative opt-ins' testimony for the proposition that some did so, does not raise a genuine dispute of material fact as to whether *Plaintiff* ever took a non-compensable break for which he should not be paid.  If Defendant had evidence to support such an assertion, the time for presenting it was now.

Given that Plaintiff has established through Watco's records that he worked over forty-hours in at least one workweek, and Defendant has failed to raise a genuine dispute of material fact as to whether any portion of that time was

---

[5] The flash drive associated with ECF No. 87-17 that was manually filed with the Clerk's Office was corrupted.  Counsel emailed a readable version of the data to the Undersigned's staff.

non-compensable, Plaintiff has established failure to pay overtime wages. Plaintiff is entitled to summary judgment on this issue.

## II.     CONCLUSION

Plaintiff's motion for summary judgment is **GRANTED IN PART** and **DENIED IN PART**.  There is no genuine dispute of material fact that Plaintiff worked in excess of forty hours in at least one week and that Defendant failed to pay Plaintiff overtime wages that week.  But, there are genuine disputes of material fact as to whether Plaintiff was entitled to overtime wages, as an employee, or whether he was an independent contractor.  Accordingly, trial is required before establishing Defendant's liability or damages on the overtime claims.  Plaintiff's breach-of-contract claim will also proceed to trial.

The Clerk shall terminate ECF No. 87 as a pending motion, and the parties are **ORDERED** to participate in Court-facilitated mediation prior to trial.  The Undersigned's staff will contact the parties to coordinate mediation.

**IT IS SO ORDERED.**

**MICHAEL H. WATSON, JUDGE**
**UNITED STATES DISTRICT COURT**